J-S31015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.W.G., III | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.W.G., JR., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 77 WDA 2017 |

Appeal from the Order Entered December 14, 2016
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):  2016 AD 11C

| | | |
|---|---|---|
| IN RE: A.S.E.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.W.G., JR., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 78 WDA 2017 |

Appeal from the Order December 14, 2016
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):  2016 AD 11B

BEFORE:   PANELLA, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, J.                         **FILED MAY 15, 2017**

D.W.G., Jr. ("Father") appeals from the order entered on December 14, 2016, granting the petition filed by S.D.S. ("Mother")  and her husband, J.M.S., ("Stepfather") to involuntarily terminate his parental rights to his female child, A.S.E.G., born in August 2007, and his son, D.W.G., III, born

in December 2005, (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b). We affirm.

In its opinion, the trial court set forth the factual background and procedural history of this appeal, which we adopt herein. **See** Orphans' Court Opinion, 12/14/16, at 1-9. On March 16, 2016, Mother and Stepfather filed the petitions seeking to involuntarily terminate the parental rights of Father to the Children. The court held an evidentiary hearing on August 10, 2016. At the hearing, Mother and Stepfather testified on their own behalf. Father testified on his behalf, and presented the testimony of P.R., his mother.

Based on this testimony and the documentary evidence admitted at the hearing, the court entered its termination order and opinion on December 14, 2016. Father timely filed notices of appeal and concise statements pursuant to Pa.R.A.P. 1925(a)(2)(i).[1]

On appeal, Father raises four issues:

I. Whether or not the Mother has demonstrated by clear and convincing evidence that the Father's conduct over a period of at least six months immediately preceding the filing of the Petition demonstrates a settled purpose of relinquishing his parental claim?

II. Whether or not the Natural Father used all available resources to preserve the parent-child relationship such that the termination of parental rights should not have been granted?

---

[1] This Court, acting *sua sponte*, consolidated the two appeals.

III Whether or not the termination of the parental rights of the responding parent should be granted where the petitioning parent actively sought to undermine and obstruct the relationship between the responding parent and his children?

IV. Whether or not the Mother or the Guardian Ad Litem put forth adequate evidence to allow the Honorable Trial Court to make a constitutionally sufficient determination regarding whether or not there exists a bond between the Father and his Children that would have a detrimental impact on the Children if it were severed?

Father's Brief, at 5.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the

record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted).

The burden is upon the *petitioner* to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).[2]

Moreover, we have explained that

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

In his brief, Father contends that the court abused its discretion or erred as a matter of law in concluding that the evidence was sufficient to support the involuntary termination of his parental rights under § 2511(a)(1) and (b).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, as noted, the court terminated Father's parental rights under § 2511(a)(1) and (b), which provides as follows:

_____

[2] Thus, the burden to support the petition is not on both the petitioner *and* the guardian *ad litem*, as alleged by Father.

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held

that

[o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988) (citation

omitted).

Further, this Court has stated that

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Father argues that the record clearly established that the Mother failed to sufficiently demonstrate that his conduct over the six months immediately preceding the filing of the petition demonstrated that he had a settled purpose of relinquishing his parental claim. Additionally, Father asserts that he put forth reasonable and significant efforts to find and contact the Children, and to maintain his bond with them, considering all of the circumstances surrounding this case.

Specifically, Father contends that he was incarcerated, and he utilized all of the resources available to him to attempt to establish a connection with the Children. At the same time, Mother was engaging in ongoing efforts to evade Father and prevent a relationship between him and the Children. Father alleges that Mother utilized his incarceration to further these efforts by refusing to provide him with a contact address, and by moving to Pennsylvania without telling him.

Moreover, Father contends that the record also clearly established that Mother actively sought to prevent and obstruct his relationship with the

Children, and that, by terminating Father's parental rights, the trial court rewarded Mother's misconduct. Father claims that, considering the totality of the circumstances and the bad faith conduct of Mother, the trial court should have excused his lack of success in contacting the Children.

Obviously, incarceration makes performance of the duty to protect, support, and maintain communication with a child much more difficult. Our Supreme Court has instructed that

> a parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

47 A.3d at 828 (quoting **In re: Adoption of McCray**, 331 A.2d 652, 655 (Pa. 1975)). "[I]ncarceration neither compels nor precludes termination of parental rights." **Id**. (quoting **In re Z.P.**, 994 A.2d 1108, 1120 (Pa. Super. 2010)).

Regarding subsection (b), Father argues that neither Mother nor the guardian *ad litem* put forth sufficient evidence to allow the trial court to make a determination as to the existence of a bond between Father and the Children that, if severed, would have a detrimental impact on them.

This Court has stated that the focus in terminating parental rights under § 2511(a) is on the *parent*, but it is on the *child* pursuant to

subsection (b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d at 1121 (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008) (citation omitted).

The fact that the child "harbors affection" for a parent and that there is a biological connection is not enough "to establish [that] a *de facto* beneficial bond exists." *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) "The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood." *Id*. (citations omitted).

"[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). "[W]e will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

With the above standards of review in mind, we have thoroughly reviewed the record, the parties' briefs, and the applicable law. We find that the court ably and methodically considered the evidence presented at trial, and addressed Father's issues. The record supports the court's factual findings, and the court's legal conclusions are not the result of an error of law or an abuse of discretion; competent evidence supports the court's

determinations. Accordingly, we affirm the court's order based on the discussion in the opinion entered on December 14, 2016. *See* Trial Court Opinion, 12/14/16.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/2017

Circulated 04/26/2017 01:43 PM

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

IN RE:
 A█████ S██████ E█████ G████
 D████ W█████ G████, III
        :
        :   NO. 2016 AD 11B
        :   NO. 2016 AD 11C
        :

HON. WADE A. KAGARISE     PRESIDING JUDGE

MARYANN JOYCE BISTLINE, ESQUIRE   COUNSEL FOR PETITIONERS

JASON M. IMLER, ESQUIRE     COUNSEL FOR RESPONDENT/FATHER (D█████ G█████)

JAMES V. MCGOUGH, ESQUIRE    GUARDIAN AD LITEM

## OPINION

**Date: December 14, 2016**

The Court has been called upon to decide a Petition for Involuntary Termination of Parental Rights regarding two minor children A████ S█████ E███ G████, born August ██, 2007 and D████ W███ G████ III, born December █, 2005.

**PROCEDURAL HISTORY:**

The Petitioners J.M.S. and S.D.S. filed Petitions for Involuntary Termination of Parental Rights regarding two minor children, A.S.E.G. and D.W.G. III., on or about March 16, 2016. Petitioner S.D.S. is the biological mother of the subject children. J.M.S. is Petitioner S.D.S.'s husband. The Respondent D.W.G. Jr., is the biological father of the subject children. The Court entered an Order on March 30, 2016 scheduling a hearing for May 9, 2016 at 1:30 p.m. The Order of March 30, 2016 also appointed James McGough, Esquire to serve as Guardian Ad Litem of the two subject children. On April 29, 2016, the Court entered an Order appointing Jason Imler, Esquire to represent D.W.G. Jr.

1

The Court conducted a hearing on May 9, 2016. At the time of that hearing, Attorney Imler on behalf of D.W.G. Jr. requested a continuance of the scheduled hearing which was granted. The Court utilized the May 9, 2016 proceeding to conduct a status conference with counsel. As a result, the Court entered an Order on that day scheduling the matter for a full day evidentiary on August 10, 2016. Further, the Court indicated that another status conference would occur on June 29, 2016. The Court conducted a status conference on June 29, 2016. As a result of that status conference, the Court issued an Order on that date reaffirming that the evidentiary hearing would take place on August 10, 2016.

The evidentiary hearing regarding the subject children occurred to its conclusion on August 10, 2016. At the close of the evidentiary record, the Court was requested by both Petitioners' and Respondent's counsel to have time to submit legal memorandums. Neither party objected to the guardian ad litem counsel's desire to simply place his position on the record at the close of the evidentiary hearing. The Court entered an Order indicating that the transcript would be transcribed no later than August 31, 2016 and that counsel would have until September 30, 2016 to present written arguments and/or briefs in support of their position. The Court received the Petitioners' legal memorandum/brief on September 30, 2016. Respondent's counsel requested an extension and filed their legal memorandum/brief on October 4, 2016. This matter is now ripe for disposition.

**FACTUAL HISTORY:**

The Petitioner S.D.S. presented testimony at the evidentiary hearing. S.D.S testified that she was born on December ●, 1988. She testified that she is the subject children's biological mother. She testified that the Respondent is the subject child's biological father. She testified that the subject child D.W.G. III was born on December ●, 2005. S.D.S. testified that she lived

2

in California at the time of D.W.G. III's birth. She resided with her parents. She testified that her parents still reside in the same house they lived in when D.W.G. III was born. S.D.S. was in tenth grade when D.W.G. III was born and had just graduated from high school when A.S.E.G. was born. S.D.S. testified that the last time the Respondent D.W.G. Jr. visited with the children was in February of 2012. S.D.S. also testified that the last time that she had heard from D.W.G. Jr. was in February of 2012. S.D.S. testified that when mail is sent to her Mother's house for her it is forwarded to her. S.D.S. testified that in addition to D.W.G. Jr. not having contact with the children she has also not received any cards, letters or gifts for the children from D.W.G. Jr. nor has he offered to provide support for the children. S.D.S. testified that he has not attempted to call the children since February of 2012.

S.D.S. testified that there is a custody order regarding the children in Fresno, California from 2008 which only referenced D.W.G III. S.D.S. indicated that the custody order required D.W.G. Jr.'s visitation to be through a third party which at the time the parties agreed would be S.D.S's father. S.D.S testified that D.W.G. Jr. saw the children a couple times but then he either did not show up at all or would show up under the influence. At that time, S.D.S. told D.W.G. Jr. that they would either have to follow the Court Order or he would have to have his visits at the Courthouse. S.D.S. testified that the visits ceased at that time. S.D.S. testified that she now desires that D.W.G. Jr.'s parental rights be terminated and that she believes that termination is in the best interest of the children. S.D.S. testified that if the parental rights of D.G. Jr. are terminated that she will proceed with a Petition for Adoption to allow her husband to adopt the children.

On cross-examination, S.D.S. testified that she left Fresno, California in May 2008 and returned to Fresno in August of 2010. She testified that she originally left Fresno, California due

3

to the fact that she did not believe that it was the best place to raise the children and also due to physical abuse that occurred during her relationship with the Respondent. S.D.S. also testified that she had a sister in Pennsylvania that could provide support. S.D.S. testified that she returned back to Pennsylvania in June of 2015. S.D.S. testified that she returned to Fresno in 2010 due to the fact that she had dropped out of nursing school and had two additional children and needed support from her parents. S.D.S. testified that she returned back to Pennsylvania in 2015 because she got married and believed that the cost of living would be better in Pennsylvania. She also indicated that after a period of time with the Respondent visiting the children he began acting out again. S.D.S. testified that on each occasion when she returned to Pennsylvania she lived in Altoona.

S.D.S. testified that she married her husband on May 25, 2013. S.D.S. testified on cross-examination that prior to relocating back to Pennsylvania in 2015 she checked with the Court in California and was informed that as long as the original notarized letter was in place with the Court that she was able to relocate. She testified on cross-examination that the Respondent was aware of her parents' residence and also had contact information for her sister.

Upon questioning from the Guardian Ad Litem counsel, S.D.S. indicated that she had no knowledge of any attempts by the Respondent to file for any modification of the original custody order in Fresno, California. S.D.S. testified that in 2008 when S.D.S. informed the Respondent that he would have to have his visitations at the Courthouse, the Respondent responded by indicating that he was not willing to pay for his visits. After that point the Respondent's visits would be random and would only occur when he asked to see the children at her parents' residence. On the occasions where the Respondent requested to see the children at S.D.S's parents, he was permitted to do so. S.D.S. testified that this occurred approximately two or three

4

times prior to her leaving California and moving to Pennsylvania. S.D.S clarified that the notarized letter that was on record with the Court was a statement permitting her to relocate to Pennsylvania. S.D.S. testified that both her and D.W.G. Jr. signed the letter in the presence of a notary. S.D.S. explained that when she initially moved to Pennsylvania D.W.G. Jr. would have contact with her by telephone pretty often. She testified that this contact occurred two maybe three times a week but it gradually stopped. S.D.S. testified that at one point the Respondent was incarcerated and the Respondent's incarceration would not allow free telephone calls and S.D.S. said she could not afford to pay for the calls. S.D.S. testified that even though the Father became incarcerated and could not contact her by telephone she received a couple letters from the Respondent that were sent to her parents' house. S.D.S. testified that the last time that she would have received a letter from the Respondent would have been in 2009 or the beginning of 2010. S.D.S testified that while D.W.G. Jr. was incarcerated he never requested that S.D.S. bring the children to see him.

S.D.S. explained that when she returned to California in 2010 and the Respondent was no longer incarcerated that he would have visits with the children at her parents' home which is where she resided. She testified that these visits ceased in 2012 when the Respondent would act inappropriately and appear to be under the influence during the visits. This is when S.D.S. indicated again that the Respondent would have to utilize the court system to get visitation. S.D.S. testified that she always allowed visits during this period of time provided that the Respondent would act appropriately. It appears from S.D.S.'s testimony during questioning from the Guardian Ad Litem counsel that at some point after the Respondent's visits ceased in 2012 that he was again incarcerated in southern California. During this period of incarceration, S.D.S. testified that he did not send any letters or cards or have any written communication with

5

the children. S.D.S.'s testimony revealed that on each occasion when she moved her residence that she notified the custody office in Fresno, California of her current address.

The period of no communication continued until the Respondent received a copy of the Petition for Involuntary Termination of Parental Rights. At that point, Respondent made contact with the Petitioner's Father in March of 2016. After receiving the Petition for Involuntary Termination of Parental Rights, the Respondent filed a Petition for Modification in the courthouse in Fresno.

Petitioner J.M.S. also provided testimony at the evidentiary hearing. J.M.S. testified that he was born on August 13, 1987. He testified that he married S.D.S. in 2013 and currently resides with her and the children. J.M.S. corroborated S.D.S.'s testimony that there hasn't been any communication from the Father nor has the Father provided any letters, packages, or notes regarding the children since 2012. J.M.S. also testified that he was aware of no barriers that existed that would have prevented D.W.G. Jr. from having contact with the children. J.M.S. explained during his testimony that D.W.G. Jr. had a relationship with S.D.S.'s father because he was his football coach in school. J.M.S. also provided testimony about his bond and relationship with the subject children.

The Respondent D.W.G. Jr. also presented testimony at the evidentiary hearing. D.W.G. Jr. testified that he was born on January 12, 1987. D.W.G. Jr. testified that he currently resides in Fresno, California with his mother. D.W.G. Jr. testified that he works for the California Department of Transportation doing maintenance. D.W.G. Jr. testified that he is the biological father of the subject children. D.W.G. Jr. testified that he was incarcerated from 2009 to 2011 and again from December 2013 to December 2015. D.W.G. Jr. testified that during his first period of incarceration he had contact with the children through written communication. He

6

indicated that this written communication started in 2009 but in 2010 his letters started being returned to him. D.W.G. Jr. testified that the returned letters were marked "return to sender". D.W.G. Jr. explained that he did not know why his letters were being returned. D.W.G. Jr. testified that when he was released from incarceration in 2011 he was reunited with his children. Immediately after his release, D.W.G. Jr. said he would see his children every other week. This period of contact eventually decreased to approximately twice a month and D.W.G. Jr. explained that as time went on the contact "trinkled down" until he started seeing the children only at and after church on Sundays. D.W.G. Jr. explained that in 2013 he would have contact with the children "once in a blue moon" when he would see the children outside of S.D.S's parents' house and he would pull over and ask if he could spend time with the children. He testified that on these occasions he was permitted to spend time with the children.

D.W.G. Jr. explained during his testimony that his contact with the children ended when he was re-incarcerated in 2013. He indicated that he did not have any means of attempting to contact S.D.S. by telephone. However, he testified that he would have his mother, sister, or grandmother attempt to go by to make contact with S.D.S. and requested that they attempt to reach out to her. D.W.G. Jr. explained that he did not have any positive results in attempts to contact S.D.S. because he did not have any contact numbers or addresses for her. D.W.G. Jr. testified that he was released from prison in December 2015. When he was released he would see S.D.S.'s sister at church. D.W.G. Jr. explained that he would ask the sister to see the children and S.D.S.'s sister said she would have to discuss the issue with her. D.W.G. Jr. explained that he would drive by her parents' house but did not actually speak to S.D.S.'s parents until the end of March. D.W.G. Jr. also explained during his testimony that he filed for a modification of his custody rights in April 2016. D.W.G. Jr.'s counsel admitted into evidence

7

the original custody order regarding the children and pointed out the provision requiring each parent to provide a telephone number where they could be reached. D.W.G. Jr. indicated that he had S.D.S.'s telephone number until he was incarcerated in 2013. D.W.G. Jr. stated his belief that he has a bond with his children and that he traveled from California to present testimony at the hearing because he opposes the Petition for Involuntary Termination of Parental Rights.

On examination from Petitioners' counsel, Guardian Ad Litem counsel, and the Court's questioning, D.W.G. Jr. testified that he had a good relationship with the Petitioners' father and that he did not send any letters to the children during his second period of incarceration. D.W.G. Jr. testified that he had contact with the children approximately four times in 2013 prior to being incarcerated. He indicated that this was because he and the Petitioner were not seeing eye to eye. He also testified that he was unaware that the Petitioner had moved back to Pennsylvania during his second period of incarceration.

The Respondent also presented testimony at the evidentiary hearing from Patricia Ross who is D.W.G. Jr.'s mother. Ms. Ross testified that she lives with D.W.G. Jr. in California. Ms. Ross testified that D.W.G. Jr. wants to see his children and often talks about seeing them. Ms. Ross also presented testimony that after she and her son visited the children in December 2012 that they attempted to contact the Petitioner after that only to find that her number had changed. When asked by Respondent's counsel if she had any experiences trying to contact the Petitioner prior to the Respondent going to jail in 2013, Ms. Ross indicated that they drove by a couple times at her residence but the Petitioner wasn't home. Ms. Ross also testified that her and her son attempted to make contact with the Petitioner at her own residence that she had with the children after she had moved from her parents. Ms. Ross also indicated that she attempted to

8

contact the Petitioner while D.W.G. Jr. was incarcerated the second time through the use of Facebook and also through word of mouth with his relatives.

The Court also heard the opinions of the Guardian Ad Litem at the evidentiary hearing. The Guardian Ad Litem testified about his observations and interactions with the subject children as well as the bond that the Guardian Ad Litem believes exists between the Petitioners and the children.

## APPLICABLE LAW:

It has long been recognized that a parent possesses a basic constitutional right to the care, custody, and control of his or her child. *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Accordingly, the termination of parental rights is "one of the most serious and severe steps a court can take." *In re Adoption of Sarver,* 444 Pa. 507, 281 A.2d 890, 891 (1971). Nevertheless, a parent's right may be terminated if he or she fails to fulfill his or her parental duties to the child. *In re B., N.M.,* 856 A.2d 847, 856 (Pa.Super. 2004), *appeal denied,* 582 Pa. 718, 872 A.2d 100 (2005). This right may be terminated if the child does not receive either proper parenting or care in a permanent, safe, or healthy environment. *Id.* Due to the gravity of the right at stake, the court takes a careful look at each case, examining its individual circumstances and considering all explanations offered by the parent, to determine whether the totality of the circumstances warrants an involuntary termination of parental rights. *In re R.I.S.,* 614 Pa. 275, 36 A.3d 567, 572 (2011) (citing *In the Matter of the Adoption of Charles E.D.M.,* 550 Pa. 595, 708 A.2d 88, 91 (1998)).

The Adoption Act governs who may bring a petition and what the petition must contain so as to terminate parental rights. Strict adherence to the Adoption Act is a prerequisite to the court's jurisdiction to hear a petition to terminate parental rights in connection with a proposed adoption. *In re Adoption of J.F.D.*, 782 A.2d 564, 565 (Pa.Super. 2001). Section 2512 states:

> (a) Who may file.—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:
>
> > (1) Either parent when termination is sought with respect to the other parent.
> >
> > (2) An agency.
> >
> > (3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).
> >
> > (4) An attorney representing a child or a guardian ad litem representing a child who has been adjudicated dependent under 42 Pa.C.S. § 6341(c) (relating to adjudication).
>
> (b) Contents.—The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights. The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted. If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.

23 Pa.C.S.A. § 2512. Assuming the petition meets the above threshold requirements, the court may then consider the underlying procedural requirements and merits of a request to terminate a parent's rights.

The party seeking the termination of parental rights bears the burden of proof in showing the grounds for termination. *In re R.I.S.*, 614 Pa. 275, 36 A.3d at 572. Specifically, for a court to terminate a parent's rights, the petitioning party must prove the asserted grounds for termination by clear and convincing evidence. *Id.* Clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

10

conviction, without hesitance, of the truth of the precise facts in issue." *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003).

The petitioning party is charged with satisfying the following two-part test to warrant the termination, which the court considers in a bifurcated manner prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Section 2511 (a)-(b) provides in pertinent part:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Pursuant to Section 2511(a), the statutory ground for termination is met "if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties" for a duration of at least six months. *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super.

11

2003), *appeal denied*, 580 Pa. 687, 859 A.2d 767 (2004) (emphasis added). The Pennsylvania Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." *In re J.T.*, 983 A.2d 771, 777 (Pa.Super. 2009) (quoting *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977)).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*Id.*; *In re C.M.S.*, 832 A.2d at 462.

While termination will not occur when parental absence is truly a result of circumstances outside of a parent's control, a parent must use all available resources to preserve the parent-child relationship. Moreover, a parent must exercise reasonable firmness in resisting obstacles that may threaten to impede the parent-child relationship. *In re Shives*, 525 A.2d 801, 803 (1987). The Commonwealth's courts have repeatedly recognized that "parental rights are not preserved...by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs." *In re C.M.S.*, 832 A.2d at 462 (citing *In re Adoption of Godzak*, 719 A.2d 365, 368 (Pa.Super 1998)).

Upon finding either a settled purpose of relinquishing parental rights or a failure to perform parental duties, the court must then consider the following three factors: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and

12

child; and lastly (3) consideration of the effect of the termination of parental rights on the child pursuant to Section 2511(b). *In re Adoption of Charles E.D.M.*, 708 A.2d at 92.

Pursuant to the first prong, the court must consider a parent's explanation for the apparent abandonment. Consideration should also be paid to any situations in which the custodial parent "has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child." *In re Shives*, 525 A.2d at 803. The pertinent inquiry is not the degree of success a parent may have had in reaching his or her child, but whether, under the circumstances, the parent employed all available resources to preserve the parent-child relationship. *Id.* (citing *In re Adoption of Faith M.*, 509 Pa. 238, 501 A.2d 1105, 1108 (1985)). Parental duty certainly does not require the impossible, but may require that which is difficult and demanding. *In re Burns*, 474 Pa. 615, 379 A.2d 535, 541 (1977). For instance, a *temporary* delegation of parental duties to a suitable caregiver during a crisis may constitute evidence of responsible parenting. *Petition of Lutheran Children and Family Service of Eastern Pennsylvania*, 456 Pa. 429, 321 A.2d 618, 620 (1974). However, a parent's failure to communicate with a child due to drug addiction or even participation in a drug rehabilitation program may not be excused if it occurs over a lengthy period. *In Interest of Q.J.R.*, 664 A.2d 164, 166-67 (Pa.Super. 1995) (affirming termination of mother's rights when she did not personally or verbally contact child for over fourteen months due to her drug addiction and treatment).

In accordance with the second prong, the court must examine the parent's post-abandonment conduct to determine whether the parent attempted to reestablish a parent-child relationship. 23 Pa.C.S.A. § 2511(b). Taken alone, past incapacity is not sufficient to warrant termination; there must be evidence of a parent's present incapacity to parent the child. *In re*

13

*Adoption of A.N.D.*, 520 A.2d 31, 35 (Pa.Super. 1986). Nonetheless, a child cannot be put "on hold" until the parent finds it convenient to communicate and care for the child. *In re D.J.S.*, 737 A.2d 283, 286-87 (Pa.Super. 1999). Merely because a parent experienced a renewed interest in the child after the six-month statutory period had elapsed does not necessarily bar termination. *Id.*

Pursuant to Section 2511(b) and as described in the above third prong, the court should consider the presence the nature and status of the emotional bond between the parent and child, with close attention paid to the effect on the child if that bond were to be permanently severed. *In re Adoption of J.M.*, 991 A.2d 321, 323 (Pa.Super. 2010) (citing *In re L.M.*, 923 A.2d at 511). Specifically, the court must determine whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. 23 Pa.C.S.A. § 2511(b). While the emotional bond shared between a parent and child is a major element of the emotional needs analysis, it is only one factor to be considered; the natural attraction between parents and children does not equate to a bond that will necessarily defeat a petition to terminate parental rights. *In re N.A.M.*, 33 A.3d 95, 104 (Pa.Super. 2011). In situations in which there is no evidence of a bond between parent and child, it is reasonable to infer that no bond exists. *In re Adoption of J.M.*, 991 A.2d at 324 (Pa.Super. 2010) (citing *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008)). After all, Section 2511(b) requires the court to determine what effect breaking an existing parent-child bond will currently have on the child; Section 2511(b) does not ask courts to speculate whether a bond may be formed in the distant future. *In re Adoption of J.M.*, 991 A.2d at 325. Because the Adoption Act seeks to achieve permanency for the child, the focus must be on the present rather than on the uncertain future. As a result, the court cannot consider

14

any efforts made by a parent to remedy conditions supporting termination when taken subsequent to the filing of the petition. *In re D.W.*, 856 A.2d 1231, 1234 (Pa.Super. 2004).

In addition to emotional needs, consideration must also be given to the child's developmental and physical needs. A parent's rights may not be terminated solely on the basis of medical care or other environmental factors, including inadequate housing, furnishings, income, or clothing, provided those factors are deemed outside of the parent's control. 23 Pa.C.S.A. § 2511(b). A parent's rights further may not be terminated simply because the child may encounter greater advantages in another home. *In re Anderson*, 464 A.2d 428, 431 (Pa.Super. 1983).

Contained within the Section 2511(b) analysis of the needs and welfare of the child, the court must also address and evaluate whether the proposed adoption is in the child's best interests. *In re E.M.I.*, 57 A.3d 1278, 1287 (Pa.Super. 2012) (citing *In re Adoption of L.J.B.*, 610 Pa. 213, 18 A.3d 1098 (2011)). Intangible benefits, such as the love, comfort, security, and stability that the child may experience with the adoptive parent, should also be considered in this needs and welfare inquiry. *In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010). Based on the totality of the circumstances from the above inquiries, the court must then determine whether an involuntary termination of parental rights is warranted.

Incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent", *In re: Adoption of S.P.*, 47 A.3d, 817, 830 (Pa. 2012).

## DISCUSSION:

We find the Petitioner's testimony at the evidentiary hearing credible. We believe the Petitioners have met their burden to establish by clear and convincing evidence that the termination of the Respondent's parental rights is warranted. The evidence in this case suggests that that Respondent failed to have any meaningful contact with the subject children after 2012. The Respondent's testimony indicated that he saw the children "once in a blue moon" in 2013. The Respondent estimated the number of contacts with the children during this period of time to be approximately four. The Respondent indicated that he failed to have any additional contact with the children in 2013 because he and the Mother were not seeing "eye to eye". We also note that once the Respondent was re-incarcerated in late 2013 he failed to have any contact with the children. During his incarceration, he testified that he did not send any cards, gifts, or otherwise establish any contact with the children. He testified that he had his family members attempt to reach out to the Mother but claims they were unable to contact her. It was only when he received the Petition to Terminate Parental Rights in this case that he re-established contact with the Petitioner's family and requested to see the children.

We believe that the Respondent failed to exercise reasonable firmness in resisting any obstacles that may have impeded the parent/child relationship. Due to the fact that we find the testimony of the Petitioners credible, we do not believe that the Petitioner created any real obstacles. Nonetheless, even if obstacles existed, the Respondent clearly failed to act in reasonable firmness to overcome these obstacles. The evidence suggests that the Respondent could have had contact with the children either directly or through the maternal grandparents prior to his incarceration in 2013 and after his release in late 2015. The testimony established that the Mother's residence was always on record with the Court in Fresno, California. We also

16

note that the Respondent's Mother testified that she was aware of a residence that the Mother lived at after she moved out of her parents' residence. The testimony also established that the Respondent had a good relationship with the Maternal Grandfather and on every occasion when he attempted to have contact with the children through the Maternal Grandfather the Maternal Grandfather allowed the contact. We also believe that during his incarceration he could have attempted to maintain further contact with the children. However, the evidence suggests that he had no contact with the children either by mail or otherwise during his incarceration. He could have filed a Petition with the Court in Fresno, California or otherwise requested an alternative means of maintaining communication with the children during his incarceration. Simply put, the Respondent failed to have any meaningful contact with the subject children, failed to maintain the parent/child relationship, and did not engage in any reasonable firmness to maintain his relationship with the children since 2012.

We also believe that the evidence suggests that the children have a strong bond with the prospective adoptive father. We believe that this conclusion is supported by the evidence and also by the recommendation of the Guardian Ad Litem counsel. Furthermore, there is no evidence of record to suggest that a bond remains between the Respondent and the subject children. For these reasons, we will enter an Order granting the Petitioner's Petition to Terminate Parental Rights.

For the above reasons, we enter the following Order:

O

    R

       D

          E

            R